UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

AIDS HEALTHCARE FOUNDATION,       )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )          Case No. 4:22-cv-00743-AGF
                                  )
EXPRESS SCRIPTS, INC.,            )
                                  )
            Defendant.            )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Express Scripts, Inc.'s ("Express Scripts") motion (ECF No. 26) to dismiss all four counts of Plaintiff AIDS Healthcare Foundation's ("AHF") amended complaint.  The Court heard oral argument on February 2, 2023.  For the reasons set forth below, the motion will be granted.

## BACKGROUND

The following facts are taken from AHF's amended complaint.  The Court also considers "[d]ocuments necessarily embraced by the pleadings," meaning "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading."  *See Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (holding that such documents may be considered on a 12(b)(6) motion; *see also Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015) (holding the same as to "documents incorporated into the complaint by reference.")

AHF owns a chain of pharmacies serving primarily people of limited economic means living with HIV/AIDS, including patients enrolled in the Medicare Part D prescription drug program.  Express Scripts is a pharmacy benefits manager ("PBM"). As such, Express Scripts administers prescription drug programs for its clients, which include commercial health plans, Medicare Part D plans, and other health insurance plans.  Specifically, it serves as an intermediary between its prescription-drug plan clients and the pharmacies that insured patients use.  Express Scripts reimburses pharmacies for prescriptions filled by patients, less the amount of the patient's copayment under his or her prescription-drug plan.  The prescription-drug plan, in turn, reimburses Express Scripts.

The Center for Medicare and Medicaid Services ("CMS") is the operating division within the United States Department of Health and Human Services responsible for administering, among other things, the Part D program.  CMS promulgates rules and regulations governing Part D plans.

**CMS "Negotiated Prices" Definition and Star Ratings**

Under the statutes and regulations applicable to Part D plans, Part D plan sponsors and PBMs must make available to beneficiaries "negotiated prices" for covered Part D drugs; in other words, "plan sponsors [are] to give to Part D plan Beneficiaries the benefit of the prices the plan sponsors actually pay to pharmacies, net of any price reductions." *Id.* ¶ 26.  Under the regulations, in effect at the relevant time, CMS defined "negotiated prices" to mean:

[P]rices for covered Part D drugs that meet all of the following:

2

(1) The Part D sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network dispensing provider have negotiated as the amount such network entity will receive, in total, for a particular drug.

(2) Are inclusive of all price concessions from network pharmacies *except those contingent price concessions that cannot reasonably be determined at the point-of-sale*; and

(3) Include any dispensing fees; but

(4) Excludes additional contingent amounts, such as incentive fees, if these amounts increase prices and cannot reasonably be determined at the point-of-sale.

(5) Must not be rebated back to the Part D sponsor (or other intermediary contracting organization) in full or in part.

42 C.F.R. § 423.100 (emphasis added) (effective Jan. 1, 2016 to Dec. 31, 2023).

According to AHF, Express Scripts and other PBMs took advantage of the "reasonably be determined" exception set forth in paragraph (2) to impose payment adjustments after the point-of-sale, purportedly based on pharmacies' performance, that effectively reduce the reimbursement rate to pharmacies. AHF describes these performance adjustments as "claw backs." AHF alleges that "claw backs are payments or payment adjustments made by PBMs after the point-of-sale that alter the agreed cost of Part D covered drugs as between PBMs and pharmacies." ECF No. 23, Am. Compl. at ¶ 23. AHF alleges that such so-called claw back programs have become "an industry wide phenomenon not unique to [Express Scripts]." *Id.* ¶ 24.

AHF contends that most of these performance adjustment programs, including Express Scripts' program, purport to use Star Ratings promulgated by CMS in order to

measure the pharmacies' performance.  CMS promulgates Star Ratings for the purpose of evaluating, ranking, and publicizing the performance of Medicare Part D plans.  CMS rates plans on a one-to-five scale, with a five rating representing the best performers. The best performing plans receive benefits such as the ability to advertise their high ratings and to enroll new members outside of enrollment periods. The best performing plans also stand to receive monetary bonuses from CMS. The Star Ratings are based on a plan's performance with respect to numerous metrics.  CMS does not use the Star Ratings or the Star metrics to impose monetary penalties on plan sponsors.

**Contracts Between AHF and Express Scripts**

AHF entered contracts with Express Scripts that permitted AHF's pharmacies to fill prescriptions for Part D beneficiaries whose benefits Express Scripts manages as a PBM.  These contracts created exclusive and mandatory "networks" for Express Scripts' plan sponsor clients.  Beneficiaries must use these networks or pay high costs for out-of-network services.  AHF's pharmacies cannot dispense prescriptions to such beneficiaries for reimbursement with Part D funds unless Express Scripts agrees. With HIV drugs, out-of-network costs can be thousands of dollars, making it impossible, from a practical standpoint, for beneficiaries to elect out-of-network services.

According to AHF, because Express Scripts is one of the nation's largest PBMs, if AHF did not contract with Express Scripts to join its network, AHF would lose the ability to provide services to patients – the vast majority of whom are people of limited economic means living with HIV/AIDS – in Express Scripts' network.

AHF and Express Scripts initially contracted in 2017.  The initial contract did not include any provision related to performance adjustments.  *See* ECF No. 29-2, Defs.' Ex. 1.  However, the contract provided for future amendments as follows:

> Unless prohibited or modified by existing law, [Express Scripts] may amend any term, part or provision of this Agreement, including without limitation, any exhibits, requirements for participation, schedules, amendments, or addenda . . . by giving written notice to [AHF] at least ten (10) calendar days prior to the Effective Date of the amendment ("Notice Period").  [AHF] shall be deemed to have accepted such amendment in the event it fails to provide written notice of its objection to [Express Scripts] prior to the expiration of the Notice Period.  If [AHF] continues to submit claims after the effective date of any proposed amendment, then such amendment will be deemed approved and accepted by [AHF] as if [AHF] had given its express written consent thereto, and such amendment shall automatically become a part of this Agreement. . . . Notwithstanding the foregoing, and only to the extent a signature is required or requested by [Express Scripts], the parties acknowledge and agree that any contract document, including, but not limited to, rate exhibits, schedules, letters of agreement, etc., proposed by [Express Scripts] and executed by [AHF] hereafter shall automatically become incorporated into this Agreement without the necessity of a formal amendment.

*Id.* at § 7.4.

Express Scripts amended the parties' contract in 2019 and 2020, in order to include a performance adjustment program that effectively reduced the reimbursement rates Express Scripts paid to AHF for filling patient prescriptions.

Specifically, a 2019 amendment to the parties' contracts governing Express Scripts' Medicare Part D network and *signed by both parties*, provided:

> In addition to [the agreed-upon reimbursement rates], and solely with respect to Applicable Covered Products, [AHF] agrees that it shall be assessed certain quarterly post point-of-sale, per Claim reimbursement adjustments ('Performance Adjustments') based on [AHF's] Pharmacies performance, as measured by [Express Scripts] and/or by a vendor designated by [Express Scripts], and as more fully described on Attachment 1.  The Performance

5

Adjustments shall be based on Provider's placement in the following performance tiers ('Performance Tiers'):

| Provider Performance Tiers | | |
|---|---|---|
| Performance Tier | Provider Ranking (Based on % of claims, across all Network claims)* | Performance Adjustment |
| 1 | Top Performers (Top 1%) | 0% of AWP |
| 2 | High Performers (Top 2 - 15%) | Up to an average of 2% of AWP |
| 3 | Standard Performers (Middle 60%) | Up to an average of 4% of AWP |
| 4 | Low Performers (Bottom 25%) | Up to an average of 6% of AWP |

ECF No. 27-6, Def.'s Ex. 5 at § 2.2.[1]  Attachment 1, in turn, described and defined "quality metrics" to be used in connection with measuring pharmacy performance as "one or more star metric and/or display measures, as published by CMS . . . ." *Id.* at Attachment 1, § 1.2.

The 2019 amendment further provided:

> The parties acknowledge and agree that more than one set of Performance Tiers (and associated Performance Adjustments) may be in effect and applied from time to time to claims submitted by Provider under the terms of this Exhibit.   [Express Scripts] shall be obligated to manage to the overall Performance Adjustment guarantees on an aggregate basis for the applicable book of business. . . .

*Id.* § 2.3.  And "[t]he parties acknowledge[d] and agree[d] that [Express Scripts] may change the method by which it deducts any Performance Adjustments at its sole discretion, so long as such change is in compliance with federal requirements, and such change shall not require the consent of, or notice to, [AHF], nor the necessity of a formal amendment." *Id.* § 6.

Express Scripts imposed a similar amendment in 2020, which provided in a "Medicare Part D Performance Program Schedule Attachment":

---

[1]      "AWP" refers to the average wholesale price.

> If a Medicare Part D Sponsor (each, a 'Participating Sponsor') implements a Medicare Part D Performance Program ('Program'), in addition to being reimbursed in accordance with the applicable Medicare Part D rates set forth in [other parts of the contract], and solely with respect to Applicable Claims (as defined below), [AHF] shall be assessed certain per claim reimbursement adjustments ('Performance Adjustments') based on [AHF's] Pharmacies performance against certain Quality Metrics (as defined below), as measured by [Express Scripts] and/or by a vendor designated by [Express Scripts], as further described herein.

ECF No. 27-9, Def.'s Ex. 8 at 12.  The amended agreement was again signed by both parties and defined "Quality Metrics" as "one or more star metric and/or display measures, as published by CMS, or adherence measures or other generally accepted quality metrics intended to measure pharmacy performance and selected by Sponsor and communicated to [AHF]." *Id.*

The 2020 amendment set forth a "network protocol" to "outline[] the calculation of performance awards for [AHF]" and its pharmacies and noted that "[Express Scripts] is the ultimate decision maker on measuring [AHF's] performance during the Evaluation Period." *Id.* at 14.  It also provided that the performance adjustments would be "assessed for each paid claim in the amount of up to 8% of ingredient cost for each 30 day claim and up to 10% of ingredient cost for each [Exception Drug Status] claim pursuant to the rates and requirements set forth in the applicable network selected by Sponsor in which [AHF] participates." *Id.* at 14, § 2.1.

Both amendments provided that the parties would "promptly renegotiate" their agreements "[i]n the event CMS releases guidance that prohibits or materially alters the economics of a Participating Sponsor's Program . . . ." *Id.* at 12-13 ("Change in Law"); *see also* ECF No. 29-6, Def.'s Ex. 5 at § 4 ("Change in Law").

7

According to AHF, because of Express Scripts' considerable bargaining leverage as one of the nation's largest PBMs, Express Scripts was able to impose the above-described performance adjustments with no competitive check even though there was no legitimate business reason to do so. AHF alleges that PBMs like Express Scripts profit significantly from these performance adjustment programs, while pharmacies like AHF suffer from lower pharmacy reimbursement rates.

AHF further alleges that the performance adjustments do not fairly or accurately measure pharmacy performance. AHF contends that the performance adjustments purport to use CMS's Star Ratings, but that the Star Ratings were not intended for such purpose. AHF further contends that the performance metrics are arbitrary, unachievable, and unreasonable, often relying on data from an aggregate of pharmacies, rather than the individual pharmacy subject to the performance scoring. ECF No. 23, Am. Compl. at ¶ 25.

AHF alleges that the performance adjustments were improper and unfair for a variety of reasons, including that they did not in fact measure pharmacy performance; they improperly punished AHF for prescribing decisions made by healthcare professionals; they imputed to AHF the average performance of other pharmacies when AHF's pharmacies had no data to score and without identifying the data on which the imputed means are calculated; and they punished pharmacies like AHF that tend to prescribe more expensive, specialty drugs that are not available in generic form.

AHF alleges that, as a result of its performance adjustments imposed between 2019 and 2022, Express Scripts under-reimbursed AHF by many millions of dollars.

**CMS Rule Change**

Following scrutiny of, among other things, performance adjustment programs like the ones created by Express Scripts and other PBMs, CMS amended its definition of "negotiated price," effective January 1, 2024, to delete the "reasonably be determined" exception.  42 C.F.R. § 423.100 (effective Jan. 1, 2024).  AHF alleges that, as a result of this rule change, beginning on January 1, 2024, Express Scripts and other PBMs will be forbidden from operating performance adjustment programs based on the "reasonably be determined" exception.  ECF No. 23, AM. Compl. at ¶ 43.

**AHF's Lawsuit**

On July 12, 2022, AHF filed suit against Express Scripts, seeking damages and injunctive relief while invoking the Court's diversity jurisdiction.  AHF alleges that Express Scripts breached its contracts or otherwise acted unlawfully in its design and imposition of the performance adjustments.  AHF asserts the following claims: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) "unenforceable unconscionable contracts," and (4) "unfair business practices" under California Business and Professions Code § 17200, et seq.

With respect to its unfair business practices claim, AHF alleges that the California statute borrows violations of other laws and treats these as unlawful practices.  Thus, AHF bases its unfair practices claim on several alleged violations of federal and state law.  Specifically, AHF alleges that Express Scripts' design and imposition of the performance adjustment program violated (1) Federal Medicare's any willing provider law, 42 C.F.R. § 423.505(b)(18), which AHF alleges "requires that all Part D plan

sponsors, and their PBM intermediaries, agree to offer participating pharmacies a contract with reasonable and relevant terms and conditions of participation"; (2) Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-213 ("FDUTPA"); (3) New York General Business Law §349; (4) Washington State's Consumer Protection Act, A.R.C.W §19.86 et seq.; (5) Georgia law, O.C.G.A. § 33-20-16; (6) Illinois Managed Care Reform and Patient Rights Act, 215 CS 134/72(A); and (7) Mississippi Code, Miss. Code Ann. § 83-9-6.  ECF No. 23, Am. Compl. ¶¶ 85-98.

AHF seeks monetary damages and injunctive relief prohibiting Express Scripts from enforcing the performance adjustment program.

## ARGUMENTS OF THE PARTIES

In its motion to dismiss, Express Scripts argues that AHF fails to state a plausible claim for breach of contract or breach of the implied covenant of good faith and fair dealing because the parties' contracts expressly permit the performance adjustments that AHF challenges.  Next, Express Scripts argues that unconscionability is a defense to contract formation and not an affirmative cause of action.  In any event, Express argues that AHF fails to allege facts to plausibly support a claim of unconscionability.

Finally, Express Scripts argues that AHF lacks statutory standing to bring an unfair competition claim under the California statute based on this private contractual dispute between two non-competitor businesses; that the statute's safe harbor bars AHF's claim because federal law clearly permits the challenged performance; and that AHF fails to state a claim in any event because AHF has failed to plausibly allege the required predicate violation of another federal or state law.

10

In response, AHF argues that it has plausibly alleged both a breach of contract and a breach of the implied covenant of good faith and fair dealing by alleging that Express Scripts paid AHF less than the contractually required reimbursement rates for reasons that have nothing to do with pharmacy performance.  AHF further argues that unconscionability may be the basis for an affirmative claim for declaratory or injunctive relief and that AHF has plausibly pled unconscionability by pleading that it had no choice but to participate in the performance adjustment program, that the parties did not negotiate the contracts on a level playing field, and that the performance adjustment program itself does not actually measure pharmacy performance but instead unfairly profits Express Scripts and its insurance company clients.

As to its unfair practices claim, AHF argues that the statutory standing caselaw cited by Express Scripts, which holds that contract disputes between businesses cannot support an unfair competition claim, does not apply to the "unlawfulness" prong of the California statute under which AHF proceeds.  Further, AHF argues that it has plausibly pled "unlawfulness" by pleading that the performance adjustment program violates the federal Medicare any willing provider law, 42 CFR §423.505(b)(18), state analogues to the federal any willing provider statute, and state consumer protection statutes.  ECF No. 33 at 17-18 (discussing federal and state statutes cited in the amended complaint).

## DISCUSSION

To survive a motion to dismiss, a plaintiff's claims must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The reviewing court accepts the plaintiff's

factual allegations as true and draws all reasonable inferences in favor of the nonmoving party. *Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017). But "[c]ourts are not bound to accept as true a legal conclusion couched as a factual allegation, and factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

As indicated above, "[w]hile courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion," courts may additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned without converting the motion into one for summary judgment." *Zean v. Fairview Health Services*, 858 F.3d 520, 526 (8th Cir. 2017) (internal citations omitted). In particular, "[i]n a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss . . . even if contract documents not attached to the complaint refute a breach-of-contract claim." *Id.* (citation omitted).

### Breach of Contract

The parties agree that Missouri law governs AHF's contract claims. Under Missouri law, a breach of contract action requires a plaintiff to allege "the existence of a valid contract, *the rights of plaintiff and obligations of defendant under the contract,* a breach by defendant, and damages resulting from the breach." *Lucero v. Curators of Univ. of Missouri*, 400 S.W.3d 1, 5 (Mo. Ct. App. 2013) (emphasis in original). "[A] plaintiff does not get to wait until discovery to identify what promises the defendant has breached . . . . [T]he complaint must, at minimum, cite the contractual provision

12

allegedly violated." *Gillis v. Principia Corp.*, 832 F.3d 865, 872 n.11 (8th Cir. 2016) (citations omitted); *Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 757–58 (8th Cir. 2021) (holding the same).  "Vague references to unspecified 'agreements' are insufficient to state a claim for breach of contract." *Reitz v. Nationstar Mortg., LLC*, 954 F. Supp. 2d 870, 884 (E.D. Mo. 2013) (citations omitted).

AHF alleges that Express Scripts breached its contracts through its "design and imposition" of the performance adjustment program.  ECF No. 23, Am. Compl. at ¶¶ 59, 61.  But the 2019 and 2020 amendments to the parties' contracts plainly permitted the design and imposition of the program, and they gave Express Scripts sole discretion in measuring AHF's performance in accordance with specific protocols set forth in the parties' contracts, including by taking into account CMS Star Metrics.  AHF has not identified how Express Scripts' calculation of the performance adjustments violated the terms of the parties' contracts, or even which contractual provisions are at issue in this respect.  Although AHF argues that the program is unfair for a variety of reasons, AHF simply has not plausibly alleged that the program breached the terms of the contract. Indeed, at oral argument AHF conceded that Express Scripts complied with the terms of the performance adjustment program as set forth in the 2019 and 2020 amendments.

AHF does not allege that the 2019 or 2020 amendments are void or invalid under Missouri contract law.[2]  Because the performance adjustments complied with the terms of the parties' contract, as amended, AHF's breach of contract claim fails as a matter of law.

---

[2]    At oral argument, AHF attempted to argue for the first time that the amendments may be void because they were not signed by AHF.  However, as Express Scripts noted

**Implied Covenant**

"Under Missouri law, generally, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 513 (8th Cir. 2018). "[T]he implied covenant is breached only if a party exercises a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the agreement and denies the other party the expected benefit of the agreement." *CitiMortgage, Inc. v. Chicago Bancorp, Inc.*, 808 F.3d 747, 751 (8th Cir. 2015). "Likewise, when there has been no subterfuge, and the contract's express terms allowed for the challenged action, there is no bad faith and thus no breach of the implied covenant." *Id.* at 752.

AHF's own allegations make clear that the parties to the contracts at issue here are both sophisticated business entities, they voluntarily entered into the agreements, AHF knowingly accepted the risk of performance-based adjustments to the reimbursement rate set forth by the plain and unambiguous language of the 2019 and 2020 amendments, and the agreement was mutually beneficial, with the benefit to AHF consisting of access to Express Scripts' patient network. Under such circumstances, AHF's allegation that

---

in its oral argument and as AHF has not disputed, complete copies of both amendments were attached to Express Scripts' motion, and both amendments contain AHF's signature. *See* ECF No. 29-6, Defs. Ex. 5 at 4 & ECF No. 29-9, Defs.' Ex. 8 at 7. Nor has AHF ever disputed that it accepted the terms of both amendments under § 7.4 of the parties' initial contract by failing to timely object to the amendments and by continuing to submit claims to Express Scripts after the effective date of the amendments.

Express Scripts "exercised its unfettered discretion under the agreement in bad faith" fails

"because . . . [Express Scripts] did exactly what the contract allowed it to do . . . and

[Express Scripts] did not act in bad faith by asserting or enforcing its legal and

contractual rights." *Id.* Missouri law does not permit the Court to "inquire further by

reviewing the validity of [Express Scripts' performance adjustment] determination"

because to do so would "contradict the unambiguous contractual language." *Id.*

Importantly, AHF's does not allege that Express Scripts misapplied the express

protocol set forth in the performance adjustment provisions of its contracts. Rather,

AHF's theory is that Express Scripts' *compliance* with those performance adjustment

provisions constitutes a breach of the implied covenant. Missouri law does not recognize

such a theory. *See, e.g.*, *Park Irmat Drug Corp.*, 911 F.3d at 514 ("[A] defendant does

not act in bad faith when it acts in accordance with express contractual rights that allow it

to terminate the agreement without cause upon thirty days notice."). AHF's implied

covenant claim thus fails as a matter of law.

**<u>Unconscionability</u>**

Under Missouri law, "[u]nconscionability is a *defense* to contract formation and

protects contracting parties from one-sided contracts, oppression and unfair surprise."

*Bridgecrest Acceptance Corp. v. Donaldson*, 648 S.W.3d 745, 754 (Mo. 2022), *as*

*modified* (Aug. 30, 2022) (citation omitted and emphasis added); *see also* Restatement

(Second) of Contracts § 208 (1981) ("If a contract or term thereof is unconscionable at

the time the contract is made a court may refuse to enforce the contract, or may enforce

the remainder of the contract without the unconscionable term, or may so limit the

application of any unconscionable term as to avoid any unconscionable result."). The parties have not cited and the Court has not found any Missouri case determining whether unconscionability may be asserted as an affirmative claim for relief. In general, however, when state law treats unconscionability as a defense, federal courts have interpreted the state law to preclude plaintiffs from asserting unconscionability as a basis for recovering damages. *See, e.g.*, *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1205–06 (9th Cir. 2010) ("Under California law, however, unconscionability is an affirmative defense, not a cause of action, [and, therefore] Rubio as plaintiff cannot assert unconscionability as an independent claim for relief.") (internal citations omitted); *Doe v. SexSearch.com*, 551 F.3d 412, 419 (6th Cir. 2008) ("At common law, unconscionability is a *defense* against enforcement, not a basis for recovering damages.") (emphasis in original).

Whether unconscionability may be used as the basis for seeking declaratory judgment, as opposed to damages, is an open question. *See, e.g.*, *SexSearch.com*, 551 F.3d at 420 ("If Doe were seeking a declaratory judgment or reformation of the contract, unconscionability could form the basis of a cause of action."); *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012, 1031–32 (E.D. Ark. 2015) (interpreting Missouri and Arkansas law to permit plaintiffs "to seek declaratory relief that the contracts at issue, or portions thereof, are unconscionable," at least at the pleading stage).

But AHF has not requested declaratory relief. It has requested an injunction against Express Scripts' enforcement of the performance adjustments. And AHF has not cited, and the Court has not found, any legal authority recognizing unconscionability as an independent cause of action for affirmative injunctive relief. The Court doubts

whether the Missouri Supreme Court would permit the doctrine to be used as a sword in this manner.

Nor does the Court find that unconscionability has been plausibly pled here. According to AHF's own allegations, both parties here are sophisticated business entities. And AHF has not alleged that Express Scripts is the only PBM or that its network is the only network serving AHF's patient base.  Indeed, AHF's complaint acknowledges that PBMs other than Express Scripts exist and that most of these other PBMs have imposed performance adjustment programs similar to Express Scripts' program.   Further, AHF concedes that, under its current regulations, CMS permits such performance adjustment programs to exist.  Under these circumstances, AHF has not plausibly pled unconscionability.  *See, e.g.*, *Park Irmat Drug Corp.*, 911 F.3d at 513 (holding that a plaintiff pharmacy failed to plausibly plead unconscionability under Missouri law, notwithstanding its allegations of Express Scripts' bargaining power as a PBM, because the pharmacy was a sophisticated consumer and had access to other PBM networks).

**<u>Unfair Practices</u>**

"California's unfair competition law (UCL) (§ 17200 et seq.) defines 'unfair competition' to mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by the false advertising law (§ 17500 et seq.)."  *Kasky v. Nike, Inc.*, 45 P.3d 243, 249 (Cal. 2002), *as modified* (May 22, 2002) (cleaned up and citations omitted).  "The UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services."  *Id.*

17

The UCL's scope is broad and "establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999) (citations omitted). "Each prong of the UCL is a separate and distinct theory of liability." *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).

AHF maintains that it is proceeding only under the "unlawful" prong. Under that prong, a practice violates the UCL if it also violates another state or federal law; "section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech*, 973 P.2d at 539–40. "[V]irtually any law or regulation—federal or state, statutory or common law—can serve as [a] predicate for a [§] 17200 'unlawful' violation." *Paulus v. Bob Lynch Ford, Inc.*, 43 Cal. Rptr. 3d 148, 165 (Cal. Ct. App. 2006)

Although the UCL "covers wide range of conduct," its scope is not unlimited. *Id.* at 161-62. In particular, "an action under the UCL 'is not an all-purpose substitute for a tort or contract action." *Id.* At 162. Rather, the UCL "governs anti-competitive business practices as well as injuries to consumers, and has as a major purpose the preservation of fair business competition." *Cel-Tech*, 973 P.2d at 539. The UCL's remedies are also limited to injunctive relief and restitution. *Id.* (citing § 17203).

Because the UCL was enacted to protect consumers and competitors, UCL claims involving "alleged victims [that] are neither competitors nor powerless, unwary consumers," generally fail to state a claim. *Linear Tech. Corp. v. Applied Materials, Inc.*, 61 Cal. Rptr. 3d 221, 237 (Cal. Ct. App. 2007). Thus, "[w]here a UCL action is based

on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks." *Id.* Rather, in such situations, the corporate plaintiff may use its resources "to seek damages or other relief" outside the UCL, such as in a breach of contract action.

"Applying *Linear Tech.*, courts have recognized that it essentially withdraws UCL standing from non-competitor corporate plaintiffs seeking to bring a UCL action based on contracts not involving the public or individual consumers." *Open Text, Inc. v. Northwell Health, Inc.*, No. 2:19-CV-09216-SB-AS, 2021 WL 1235254, at *2 (C.D. Cal. Feb. 19, 2021) (collecting cases). "In other words, a dispute between commercial parties over their economic relationship does not give rise to a UCL claim." *Id.* (citing *ChromaDex, Inc. v. Elysium Health, Inc.*, 301 F. Supp. 3d 963, 975 (C.D. Cal. 2017)). This is true even if the corporate plaintiff asserts that the contract was one of adhesion. *See Open Text, Inc.*, 2021 WL 1235254, at *3.

AHF correctly notes that *Linear Tech* involved a UCL claim under the "unfair" prong. However, the *Linear Tech* court did not limit its holding to allegations of unfairness. The court relied on the purpose of the statute as a whole, rather than on any of the three prongs in particular. For that reason, other federal courts have applied *Linear Tech* to UCL claims alleging unlawfulness. *See, e.g.*, *DCR Mktg. Inc v. US All. Grp., Inc.*, No. SACV1901897JVSDFMX, 2020 WL 4938360, at *5 (C.D. Cal. July 9, 2020) (applying *Linear Tech* to dismiss UCL claim by a corporate plaintiff customer alleging unlawful conduct in violation of federal criminal statutes); *ChromaDex*, 301 F. Supp. 3d at 975 (holding the same with respect to UCL claims alleging unlawful conduct in

19

violation of patent law); *but see Aton Ctr., Inc. v. Nw. Administrators, Inc.,* No.

21CV1843-L-MSB, 2022 WL 4229307, at *5 (S.D. Cal. Sept. 13, 2022) ("*Linear*

*Technologies* did not address claims alleging unlawful practices. Defendant cites no

authority and does not argue that only consumers and competitors can state a claim based

on unlawful practices.").

Like the corporate plaintiffs in *Linear Tech* and its progeny, AHF cannot convert

this contract dispute between two sophisticated, non-competitor businesses into a claim

under the UCL.   The alleged harm is to AHF in its capacity as a corporate contractor, not

to individual consumers or the public.   To argue otherwise, AHF points the following

allegation in its complaint:

> Claw Back Programs involve PBMs taking back from pharmacies massive
> public Part D monies earmarked to pay for prescriptions for people of limited
> financial means and paying that money back to the Part D plan sponsors
> (insurers), *resulting in Beneficiaries experience higher prescription costs*,
> pharmacies like AHF receiving millions of dollars less than the negotiated
> reimbursement rates for those public Part D monies, and massive profits for
> PBMs and their private insurer clients. This is an industry wide phenomenon
> not unique to [Express Scripts].

ECF No. 23, Am. Compl. ¶ 24 (emphasis added).   But nowhere in the complaint does

AHF explain how performance adjustment programs, alone, result in higher prescription

costs for consumers.

AHF's bare, conclusory allegation of possible downstream effects on consumers is

insufficient to bring its claim within the UCL's ambit.   *See, e.g.*, *TopDevz, LLC v.*

*LinkedIn Corp.*, No. 20-CV-08324-SVK, 2021 WL 6113003, at *3–4 (N.D. Cal. Dec. 27,

2021) (rejecting allegations of a similarly "tenuous relationship between the contracts at

issue and the public interest" as "insufficient to establish that this case involves the public in general or individual consumers" under the UCL).[3]

For these reasons, the Court concludes that AHF fails to state a claim under the UCL, and the Court will dismiss that claim without reaching Express Scripts' other arguments.

## CONCLUSION

Although the Court understands AHF's concerns and its needs with respect to its particularly vulnerable patient base, those concerns are better addressed—and in fact have been addressed—by CMS.  The Court simply cannot remedy those concerns within the rubric of contract law or equity.

Accordingly, and for the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendant Express Scripts, Inc.'s motion to dismiss is **GRANTED**.  ECF. No. 15.

All claims against all parties having been resolved, the Court will enter a separate Order of Dismissal.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 28th day of February, 2023.

---

[3]     Moreover, any such harm to consumers would not be remedied by awarding restitution or injunctive relief to AHF under the UCL.  An order from this Court enjoining Express Scripts from enforcing the performance adjustment program or awarding restitution to AHF, alone, would only benefit AHF, not the public at large.